IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL DOCKET NO.: 5:11CV123-RLV

| | |
|---|---|
| COLETTE SURRATT,<br>      Plaintiff,<br><br>v.<br><br>APPLE GOLD, INC.,<br>d/b/a APPLEBEE'S NEIGHBORHOOD<br>GRILL AND BAR,<br>      Defendant. | **Memorandum and Order** |

**THIS MATTER** is before the Court upon Defendant's Motion for Summary Judgment and all related materials. (Docs. 12-17, 22, 23)

**I.**

Plaintiff Colette Surratt ("Surratt") commenced this lawsuit on June 21, 2011, in the General Court of Justice, Superior Court Division, Catawba County, North Carolina, against her former employer, Defendant Apple Gold, Inc., d/b/a Applebee's Neighborhood Grill and Bar ("Apple Gold"). (Doc. 1 / Exh. A) Surratt, a resident of Hickory, North Carolina, was employed at the Hickory Applebee's Restaurant prior to termination of her employment. (Surratt Dep., at 4; Stoltz Decl., ¶ 2) In her Complaint, Surratt alleges that Apple Gold discriminated against her based upon her race, namely, via wrongful discharge in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the public policy of North Carolina, N.C. Gen. Stat. § 143-422.2.[1]

---

[1] Surratt did not file her Complaint within the ninety day period after receipt of the EEOC's right-to-sue letter. (Def.'s Mem. In Supp., at 6 n. 2) For this reason, unlike most employment discrimination cases, Surratt's Complaint does not include any race discrimination claim under Title VII of the Civil Rights Act, 42 U.S.C. §2000e, *et seq*.

On September 8, 2011, Defendant filed a timely Notice of Removal, removing the case to this federal district court. (Doc. 1) On September 15, 2011, Defendant filed its Answer disputing Plaintiff's claims. (Doc. 4) Defendant now moves for summary judgment.

**II.**

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2010). In order to support or oppose a summary judgment motion, a party is required to cite to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials;" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1); *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) (applying former version of Rule 56); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (same). A genuine dispute exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

In conducting its analysis, the Court views the evidence in the light most favorable to the non-moving party. *Celotex Corp.*, 477 U.S. at 325. "The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party." *Pyatt v. Harvest Hope Food Bank*, 2012 WL 1098632, * 2 (D.S.C. February 1, 2012) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). "The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms." *Id*. (citing *Reeves*, 530 U.S. at 148 (stating that "[c]ertainly there will be

instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory")).

**III.**

Surratt, who is African-American, was employed with Apple Gold from June 17, 1993 through June 25, 2008. Surratt began working for Apple Gold in a Prep Cook position. (Exh. A / Surratt Decl. ¶ 2) As a Prep Cook, Surratt set up stations for cooks, and maintained product presentations, product quality and cook time standards, preparation of all menu items, and specifications. (Surratt Dep., at 11.)

In 2000, Surratt was promoted to Certified Key Hourly Kitchen Manager, which entailed managing, scheduling, placing produce orders, line cooking, and plate presentations. (Surratt Dep., at 12.) In this role, Surratt was designated a Back of House ("BOH") Manager. (Surratt Decl., ¶ 4) Surratt was responsible for the hourly employees working in the kitchen. (Surratt Dep., at 12.) Surratt also had the authority to consider applicants seeking to work in the kitchen, including conducting an initial or preliminary interview of the applicant and administration of a pre-employment assessment test (or "SQII" test). (Surratt Decl., ¶ 4; Stoltz Dec., ¶ 6)

Surratt was eventually certified as an Apple Gold trainer. (Surratt Decl., ¶ 3) Surratt participated in the opening of twelve Applebee's Restaurants within North Carolina during her Apple Gold tenure and was recognized as an Apple Elite Team Member. (Surratt Dep., at 11; Surratt Decl., ¶ 5)

Apple Gold concedes that prior to her last six months of employment, Surratt had not

received any formal notice that her performance was deemed unsatisfactory.2 (Surratt Decl., ¶ 5 / Hambright EEOC Witness Interview - describing "Satisfactory +" performance by Surratt in 2006 and 2007). In fact, Surratt had regularly received bonuses for her work as a manager – the most recent bonus awarded a month prior to termination. (Exh. D / Compensation Report at Apple Gold - 00016).

According to Surratt, she did not experience problems in the workplace until 2006 – after Adam Shoemaker ("Shoemaker"), a white male, became one of her supervisors. (Surratt Dep., at 69.) Reportedly, Shoemaker had a reputation for making "racial and derogatory remarks regarding African-American customers . . . ." and [was known / or at least on one occasion] to refer to African-Americans generally as "fucking niggers." (Ruby Decl.., ¶¶ 8, 9) Surratt's co-worker Susan Ruby opined that "Adam does not like black people." (Ruby Decl., ¶ 9) Implying that Shoemaker held her to a higher standard than other employees because of her race, Surratt testified that Shoemaker antagonized her, questioned her judgment, disregarded her suggestions, and sought to alienate her from other staff. (Surratt Dep., at 69-70.)

Greg Hambright ("Hambright"), General Manager of the Restaurant, conducted a meeting in January 2008 with Surratt and Shoemaker in which Hambright encouraged Surratt and Shoemaker to work together as a team. (Hambright Decl., ¶ 4; Surratt Decl., ¶ 8) Although Hambright represents that he gave Surratt a verbal warning "regarding insubordination and improper personal conduct" during the January 2008 meeting, Surratt denies that insubordination

---

2 Apple Gold does not dispute this fact or produce any personnel records other than what is described within this Memorandum and Order. The EEOC Witness Interviews, which are not authenticated or sworn or subscribed to, are not admissible at summary judgment pursuant to Rule 56(e) of the Federal Rules of Civil Procedure. *See Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir.1993) (internal citations omitted). Nonetheless, the statements provide helpful background information and are not relied upon for any determinative factual issue.

was even a topic. (Hambright Decl., ¶ 4; Surratt Decl., ¶ 8)

On or about June 24, 2008, Surratt interviewed an applicant for employment and administered the SQII test. (Surratt Dep., at 27.) According to Surratt, Shoemaker challenged the procedure Surratt followed despite the fact that the procedure had been in place for a period of time and had been expressly approved of by Hambright.3 (Surratt Decl., ¶¶ 6,7; Ruby Decl., ¶ 4) When Surratt gave the SQII test to Ruby to grade, Shoemaker questioned the fact that he was not asked to grade the SQII test.[4] (Surratt Dep., 27-30.) An exchange between Surratt and Shoemaker followed. (Id.) According to Surratt, she answered all of Shoemaker's questions and was civil throughout. (Surratt Dep., at 27-28.) According to Susan Ruby:

> After Colette administered an SQII test to a potential employee, it was customary for her to give [Ruby] the test to grade. Greg Hambright, Adam Shoemaker, and Amanda Reed were all aware of this process.
>
> ***
>
> On June 24, 2008, [Ruby] witnessed some of the events that took place regarding Colette's administration of the SQII test to a potential Hispanic employee. [Ruby] was in the office when Colette handed [her] the SQII test to grade and Adam Shoemaker spoke in a "nasty" condescending tone about Colette not giving him the test to grade.

(Ruby Decl., ¶¶ 4, 6) Apple Gold contends that Surratt refused to answer or respond to Shoemaker again later in the day. (Surratt Dep., at 30.)

Shoemaker subsequently recommended to Hambright that Surratt's employment be

---

[3] More specifically, if the applicant met the requisite qualifications, Surratt would administer the SQII test to the applicant and then give the test to another key hourly employee for grading. (Surratt Decl., ¶¶ 4,6-7) Surratt typically provided the SQII tests to Susan Ruby, another key hourly manager who had Front of the House ("FOH") responsibilities. (Surratt Decl., ¶ 7; Ruby Decl., ¶ 4)

[4] According to Shoemaker, only a salaried manager would have the capability to input the test answers into the system and retrieve the results because an access code was required to utilize the software / application. (Shoemaker EEOC Witness Interview).

terminated. (Hambright Decl., ¶ 6) Shoemaker allegedly informed Hambright that on June 24, 2008, Surratt "had ignored him several times and refused to respond to his direct questions regarding her interview of a potential new kitchen employee." (Hambright Decl., ¶ 6) The following day, Hambright and Shoemaker advised Surratt that her employment was being terminated. (Hambright Decl., ¶ 10; Stolz Decl., ¶ 11)

On August 19, 2008, Surratt filed a complaint with the EEOC claiming that her employment with Apple Gold was terminated because of her race.[5] (Stolz Decl., Exh. 6) Apple Gold represents that the decision to terminate Surratt's employment "had nothing to do with her race" and that "race was not a factor." (Stolz Decl., ¶¶ 19,26). Rather, Apple Gold asserts that Surratt "was terminated by manager Adam Shoemaker for insubordination and unsatisfactory conduct and performance." (Stolz Decl., ¶ 11)

**IV.**

Title 42, United State Code, Section 1981, which provides for equal rights generally, reads in pertinent part:

> "All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ."

42 U.S.C. § 1981(a).

The North Carolina Equal Employment Practices Act ("NCEEPA"), codified at N.C. Gen. Stat. § 143-442.1 *et seq.*, provides that, "it is the public policy of this State to protect…employment without discrimination …." *Id.*[6]

---

[5] The EEOC issued a right-to-sue letter on or around September 8, 2009. (Exh. F)

[6] In interpreting this charge, North Carolina courts "have recognized a private right of action under this "public policy" only where the alleged discrimination resulted in termination." *Ravan v. Forest*

The framework for summary judgment analysis in cases alleging race discrimination pursuant to Section 1981 and N.C. GEN. STAT. § 143-422.2 is the same as under Title VII.[7] *See Gariola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir.1985) (Section 1981 and Title VII); *North Carolina Dep't of Correction v. Gibson*, 301 S.E.2d 78, 82-85 (1983) (N.C.G.S. § 143-422.2 adopts Title VII analysis). Accordingly, there are two avenues of proof available to Plaintiff. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir.2004) (en banc) (internal citations omitted). Surratt may provide direct evidence of discrimination, such as "conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir.1999) (quoting *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir.1995)). In the absence of direct evidence, Surratt may proceed under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

Plaintiff relies solely on circumstantial evidence and the *McDonnell Douglas* pretext paradigm.[8]

---

*Pharmaceuticals, Inc.,* 2009 WL 1152190 (W.D.N.C. 2009) (citing *Whitt v. Harris Teeter, Inc.*, 359 N.C. 625 (2005)); *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000) (explaining that the Fourth Circuit Court of Appeals construes NCEEPA in the same manner; public policy consistent with common law wrongful discharge action).

[7] Plaintiff's state law public policy claim under § 143-422.2 effectively merges with her Section 1981 claim.

[8] Surratt does not produce any direct evidence that her termination was prompted by a discriminatory motive. Here, Surratt claims that Shoemaker harbored a racially discriminatory attitude toward African-Americans generally as well as toward African-Americans that frequented the restaurant. However, the only purported derogatory remark in evidence *related to Surratt specifically* is Ruby's statement that she overheard Shoemaker question Surratt's compensation. (Ruby Decl., ¶ 5) Accepting Ruby's statement as true, Shoemaker's comment has no nexus to the decision to terminate Surratt's employment or the precipitating events. See e.g., *Stephens v. Neal's Pallet Company, Inc.*, 2012 WL 2994651, * 2 (W.D.N.C. July 23, 2012) (citing *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir.1999) (alleged discriminatory attitude or remarks must be related to the employment decision

Under *McDonnell Douglas,* the plaintiff must first make out a *prima facie* case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). A *prima facie* case alleging discriminatory discharge requires that Surratt show: 1) that Surratt is a member of a protected class; 2) that Surratt was qualified for her job and had satisfactory performance; 3) that Surratt was fired; and 4) that other employees who were not members of the protected class were retained under similar circumstances. *See Washington v. City of Charlotte*, 219 F.Appx. 273, 276 (4th Cir. 2007); *Muldrow v. Schmidt Baking Co., Inc.*, 2012 WL 4838500, * 7 (D.Md. October 5, 2012) (*prima facie* case not established due in part to plaintiff's inability to prove up satisfactory performance where record included at least eight poor performance evaluations and two infractions the month prior to termination) .

After the plaintiff establishes a *prima facie* case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the termination. *See McDonnell Douglas*, 411 U.S. at 802-03. The employer's burden at this stage "is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotation marks omitted). If the employer meets this burden, "the presumption of discrimination created by the *prima facie* case disappears from the case" and the plaintiff must prove that the "proffered justification is pretextual." *McDonnell Douglas*, 411 U.S. at 802-03; *see also Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 255 (1981).

No matter which method of proof is used, plaintiff maintains the burden of persuasion as to the ultimate issue – whether plaintiff can demonstrate, by a preponderance of the evidence,

---

being challenged), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003); *see also Diamond v. Bea Maurer, Inc.*, 128 Fed.Appx. 968, 971-72, 2005 WL 943631 (4th Cir.2005) (internal citations omitted).

that plaintiff was the victim of intentional discrimination on the part of her employer. *See Diamond v. Bea Maurer, Inc.*, 128 Fed. Appx. 968, 971-72, 2005 WL 943631, * 2 (4th Cir.2005) (citing *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511 (4th Cir.1994)); *Reeves*, 530 U.S. at 142-43 (citing *Burdine*, 450 U.S. at 453.)

"A court's sole concern is whether a plaintiff's discharge was motivated by discrimination: it is not a court's province to decide whether the reason was wise, fair or even correct, ultimately, so long as it was truly the reason for the plaintiff's termination." *Murry v. Jacobs Technology, Inc.*, 2012 WL 1145938, * 9 (M.D.N.C. April 5, 2012) (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir.1998) (internal quotation marks omitted)).

In this case, the first and third *prima facie* criteria are not in dispute since Surratt, an African-American, was fired by Apple Gold. However, the level of Surratt's performance at the time of her termination and the identification of other employees outside of the protected class that were retained under similar circumstances present significant hurdles for Surratt.

For the reasons explained herein, the Court concludes that whether Surratt's job performance was satisfactory at the time of her termination – which is also an aspect of Plaintiff's argument concerning pretext – presents a genuine dispute of material fact.[9]

Surratt was employed with Apple Gold a total of fifteen years and served as a key hourly

---

[9] Apple Gold discounts the significance of this factual dispute given that the question of Surratt's alleged insubordination is probative of the ultimate question – *i.e.*, whether Surratt presents sufficient evidence from which a reasonable jury could infer that Apple Gold acted with a discriminatory motive. *Reeves v. Sanderson Plumbing Co.*, 530 U.S. 133, 151 (2000). The question of Surratt's alleged insubordination factors into the *prima facie* case, serves as Apple Gold's legitimate non-discriminatory reason for its decision, and plays a role in the fact finder's analysis regarding whether insubordination was, in fact, the reason for Surratt's termination or a pretext for discriminatory racial animus. *See e.g.*, *Muldrow v. Schmidt Baking Co., Inc.*, 2012 WL 4838500, *9 (D.Md. October 5, 2012) (noting that plaintiff's arguments about pretext overlap considerably with his argument about the legitimacy of defendant's job expectations).

kitchen manager for eight years prior to her separation from employment. (Surratt Dep., at 26.) Surratt's "qualifications," as such, are not in dispute. *See e.g., La Montagne v. Am. Convenience Prods., Inc.*, 750 F.2d 1405, 1409 n. 2 (7th Cir.1984) ("When an employee of long standing is discharged, the more appropriate concern would appear to be [] job performance . . . ."). For this reason, the Court's analysis focuses on the evidence proffered in connection with Surratt's performance.

In doing so, the undersigned considers Apple Gold's view of Surratt's performance, as the employer's perception (as opposed to Surratt's self-assessment) is the proper measure for insubordination. *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir.2003); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir.1996) (internal citation omitted). The law is well established that Surratt's self-assessment, standing alone, cannot establish a genuine issue of material fact regarding satisfactory job performance. *Id.*

Apple Gold presents evidence from three management personnel claiming that Surratt was discharged due to incidents of insubordination that occurred over a six-month period.[10] Robert J. Stolz ("Stolz"), Apple Gold's Vice President of Development and General Counsel of the Apple Gold Group (of which Apple Gold is a member), declares that, "Apple Gold did not terminate Ms. Surratt's employment because she interviewed potential new kitchen employees or

---

[10] Apple Gold has met its burden of production to articulate a legitimate, non-discriminatory basis for the challenged employment decision. Apple Gold's ability to terminate employment for conduct deemed insubordinate is not at issue. (Surratt Dep. 38-39.) Indeed, Apple Gold's "Rules of Conduct" expressly prohibit insubordinate behavior. (Surratt Dep., Exh. 3 at Apple Gold 00143.) In Apple Gold's "Crewmember Handbook," a resource provided to employees, insubordination is specifically identified as one of several potential grounds for an employee's termination. (Surratt Dep., Exh. 3 at Apple Gold 00144.) Apple Gold defines insubordination as the "[r]efusal to follow management's lawful instructions concerning a job-related matter." (Surratt Dep., Exh. 3 at Apple Gold 00144.) Similarly, the Crewmember Handbook identifies unacceptable conduct as including "[d]isrespectful behaviors or discourteousness toward guests, managers, [or] fellow employees." (Id.) Surratt does not argue that Apple Gold's expectations in this area are anything other than legitimate.

because she administered or graded a SQII Test . . ." in that key hourly employees are authorized to do so. (Stolz Decl., ¶¶ 2,6) According to Defendant Apple Gold, Surratt had received prior warnings of insubordination and had specifically received two prior written warnings. (Stolz Decl., ¶¶ 8-10).

In support, Apple Gold produces two notices of disciplinary action (*i.e.*, Counseling Forms) purporting to document verbal warnings given to Surratt in recent months by management. One disciplinary form indicates it was prepared by Hambright and documents alleged insubordination and improper workplace conduct by Surratt occurring on January 9, 2008. (Exh. C) Hambright describes "a pattern of insubordination, which included ignoring her managers' directions and failing to respond to her managers at the Restaurant, including [Hambright]." (Hambright Decl., ¶ 4) The second disciplinary notice form represents that it was prepared by Amanda Reed ("Reed"), an Assistant Manager, to record insubordination occurring in May 2008. (Exh. C) According to Reed, Surratt "repeatedly chooses to ignore any type of communication" from Reed, "from simply not returning a 'hello' to refusing to even acknowledge [Reed's] presence when [] expoing and [Plaintiff] is on [the cook's production] line."[11] (Reed Decl., ¶ 4 / Exh. A) Neither of the notices were dated by management or signed by Surratt. For instance, the Counseling Form prepared by Reed includes the following notation: "form not dated. mgmt. reports it is from approximately May, 2008." (Exh. C) It is undisputed that Surratt was never shown or provided with a hard copy of either of the notices of disciplinary

---

[11] The term "expoing" refers to a process whereby an assistant manager (like Reed) would give verbal directions to cooks behind the chef's line (like Surratt) "in order to indicate the immediate priorities and needs in terms of food preparation based on incoming customer orders and to effectively control the production process." (Stolz Decl., ¶ 10) According to Apple Gold, "[c]ommunication between the kitchen staff and the expo regarding the customers' orders and the proper presentation of food on plates is critically important during the expoing process." (Stolz Decl., ¶ 10)

action.[12]

Surratt, who had a relatively successful career with Apple Gold, argues that the actions cited by management as insubordinate, and her discharge as a result, is mere pretext.[13] In fact, contrary to Apple Gold's representations, Surratt claims that she was *never even counseled* by any of the managers concerning purported insubordination. (Surratt Decl., ¶ 11) ("My managers have never told me that I was disrespectful, failed to answer questions, or that I ignored my managers."). Surratt likewise raises questions about the incomplete documentation relied on by Apple Gold as evidence of Surratt's repeated acts of insubordination (*i.e.*, the disciplinary records generated by Hambright and Reed) and suggests, albeit subtly, that the personnel action forms may have been created after-the-fact by Apple Gold to justify her termination. Surratt specifically questions whether Assistant Manager Reed's alleged Counseling Form was fabricated given that Surratt never worked the same shift as Reed.[14] Thus, Surratt contends that

---

[12] According to Hambright, even though the form contemplates that an employee signature will be obtained, Hambright states it is his practice not to present the written form to an employee for signature when giving a verbal warning. (Exh. C - Hambright EEOC Witness Interview)

[13] According to Apple Gold, Surratt admits to the actual conduct and only disagrees with the characterization by management. (Surratt Dep. 28, 70.) Surratt states that Apple Gold's assertion that Surratt conceded her actions constituted insubordination is disingenuous. Surratt states she "in no way admitted to engaging in subordination, disrespectful behaviors or discourteousness." (Surratt Dep. 38-39.)

[14] In her opposition brief, counsel for Surratt represents:

The allegations made by Amanda Reed are not credible. Reid was neither Plaintiff's supervisor nor manager and, more importantly, Plaintiff and Reed worked entirely different schedules and only saw each other in passing. Plaintiff worked the day-shift and Reed worked the night-shift. Plaintiff and Reed did not prep customer orders together.

(Pl.'s Mem. In Opp'n, at 11-12) (citing Exh. C - Hambright EEOC Witness Interview and Reed EEOC Witness Interview; Surratt Decl., ¶ 9). While Reed admits in her EEOC Witness Interview that Reed "worked mostly during night shift and was rarely with [Plaintiff]," Reed reported to the EEOC Investigator that she had been expressing frustration with Surratt in management meetings since February

under these circumstances a reasonable jury could question the validity of the more recent disciplinary action relied upon by Apple Gold. *See e.g.*, *Murry v. Jacobs Technology, Inc.*, 2012 WL 1145938, *10 (question of fact existed regarding whether plaintiff was meeting employer's legitimate expectations prior to termination given plaintiff's evidence that employer never provided notice to plaintiff that his performance was deficient) (citing *Reed v. Buckeye Fire Equip.*, 241 F.App'x 917, 927 (4th Cir.2007)). Although Surratt's last six months of employment may be *more probative* of determining satisfactory performance than any earlier period, Surratt's fifteen-year work history was essentially discipline-free until six months prior to her separation. *See Warch v. Ohio Casualty Insurance Co.*, 435 F.3d 510, 516 (4th Cir.2006) ("The further back in time a court goes to evaluate an employee's performance, the more removed the evidence is from the time of the termination.") (evaluating *prima facie* case of unlawful age discrimination); *see also O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 547 (4th Cir.1995) (review of employee's 1989 performance was irrelevant to a determination of whether performance was satisfactory at the time of termination in August 1990), *rev'd on other grounds*, 517 U.S. 308 (1996).

Moreover, Surratt's bonus *a month prior* to her loss of employment for alleged insubordination is not adequately explained. According to the Compensation Records produced by Apple Gold, Surratt received monetary bonuses periodically. The last such bonus was on May 9, 2008, in the amount of $285.73 and is denoted as "SB MANAGER BONUS P." (Pl.'s

---

2008. (Reed EEOC Witness Interview) In response to the Investigator's question as to why the form was incomplete (*i.e.*, not dated and did not identify how Surratt could improve her performance), Reed stated that she was aware that it was not entirely complete, that she "would be more careful filling out [her] Counseling forms" in the future, and that Hambright never followed up or complained that the form was incomplete. (Id.) Reed further explained that Surratt was not told that the verbal warning was being documented and that it would become a part of her personnel record. (Id.)

Exh. D / Compensation Records).  Apple Gold does not speak to this fact in its memoranda and exhibits.  Stolz does not explain whether the manager bonuses were automatic based upon restaurant sales for a given period of time or whether management would have had to expressly request that Surratt achieve a bonus as recently as May 9, 2008.   In the latter instance, given Surratt's bonus in such close proximity to her discharge, a jury could reasonably infer that Apple Gold's insubordination rationale is unworthy of credence.

In addition to her own testimony that she was discriminated against by her employer, Surratt produces evidence in the form of sworn statements from co-worker Susan Ruby corroborating Surratt's subjective perception of Shoemaker's view and conduct towards Surratt, as well as Shoemaker's overall attitude towards minorities and reputation for making inappropriate, derogatory racial comments in the workplace.  (Ruby Decl.)  Whether Shoemaker's alleged discriminatory bias was a factor in his recommendation to fire Surratt is a question for the factfinder.  On this record, the Court cannot find, as a matter of law, that a reasonable jury must *necessarily* conclude that Surratt was terminated due to insubordination and / or improper workplace conduct.

Similarly, the Court concludes that a genuine dispute of fact exists regarding disparate treatment.  To satisfy the fourth *prima facie* element, Surratt must identify other employees outside of the protected class that are similar in all relevant respects and show different or disparate treatment.  *Haywood v. Locke*, 2010 WL 2711294, * 3 (4th Cir.2010).

The question then arises whether Ruby and Surratt are similarly situated for purposes of the prescribed disparate treatment analysis.  "To be deemed "similarly situated," the individuals with whom the plaintiff seeks to compare her treatment must have dealt with the same supervisor and been subject to the same standards, and there must be no distinguishing or mitigating

circumstances." *Pyatt,* 2012 WL 1098632, * 7 (plaintiff not able to identify a proper co-worker comparator because duties were vastly different and the two employees were subject to different standards) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992)). Apple Gold contends that Ruby is not similarly situated to Surratt because Ruby has never been disciplined for insubordination. Surratt responds alternatively that "[e]ven assuming that Plaintiff engaged in acts of insubordination . . ., there is evidence that other similarly situated employees outside of Plaintiff's protected class engaged in acts of insubordination ."15 (Pl.'s Mem. In Opp'n, at 14.) For purposes of resolving the instant motion, the undersigned need not consider Surratt's unsupported claim of "other similarly situated employees" because Apple Gold's assertion that Surratt engaged in acts of insubordination and exhibited improper workplace conduct is the determinative factual dispute for trial.

Viewing the existing evidentiary record in the light most favorable to Plaintiff, at least one white employee (Susan Ruby) was retained despite reliance on / adherence to the same "SQII" test procedure that gave rise to the conflict on June 24, 2008.[16] (Ruby Decl., ¶ 7) Ruby, a key hourly manager (like Surratt), followed the same procedure as Surratt, was apparently not questioned or antagonized by Shoemaker, and retained her position. (Ruby Decl., ¶ 7) Because it

---

15 Surratt relies on Reed's EEOC Witness Interview, which identifies kitchen co-workers (plural) that did not listen to her instruction, as evidence. (Pl.'s Mem. In Opp'n, at 8, 14.) Read in context, Reed's statement appears to attribute the kitchen co-workers' response to Surratt. As noted, *supra*, the EEOC Investigator's interview notes are not sworn statements. Thus, Surratt fails to produce any admissible evidence in support of this issue.

[16] Surratt and Ruby report that a white male employee, Andrew Cupet, reported to work multiple times intoxicated but was never terminated. (Surratt Dep.; Ruby Decl., ¶¶ 10-12) However, the record indicates that Cupet was a server - not a key hourly manager like Surratt. (Def.'s Reply, at 9.) In addition, reporting for work while intoxicated is surely worthy of disciplinary measures by Apple Gold, the factual circumstances are too dissimilar from the circumstances surrounding the dismissal of Surratt to give rise to an inference of racial discrimination. *See e.g., Pyatt*, 2012 WL 1098632, * 7. For this reason, the undersigned does not consider Cupet to be similarly situated to Plaintiff.

is undisputed that Surratt's termination was at least precipitated by the events surrounding the initial screening of a potential new kitchen employee and the procedure followed by Surratt, a genuine dispute of material fact also exists concerning Surratt's ability to produce evidence of a similarly situated comparator.

Finally, to the extent Surratt bases her pretext argument on inconsistent statements made by Hambright, the Court is not persuaded. According to Surratt, Hambright originally reported to the EEOC that Surratt's termination was driven by the circumstances surrounding the hiring of a new kitchen employee on June 24, 2008. (Hambright EEOC Witness Interview) Surratt argues that Hambright's statements (to the EEOC Investigator and as proffered in this lawsuit) are inconsistent and, therefore, may be considered as evidence of pretext.17 *See e.g., Wesley v. Arlington County*, 354 Fed. Appx. 775 (4th Cir.2009) (citing *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846 (4th Cir. 2001)). Although Surratt attempts to contrast the response given by Hambright to the EEOC, which mentions the events of June 24, 2008, and the position taken in this lawsuit, a thorough review (as opposed to selective "cherry-picking") reveals no substantive inconsistency. In both the EEOC Witness Interview and the Declaration, Hambright points to passive-aggressive type conduct deemed to be insubordinate by management as the underlying issue and ultimate basis for termination.18 In other words, a reasonable jury could also find that the June 24, 2008 exchange between Surratt and Shoemaker simply highlighted the difficulty

---

17 Surratt contends that Hambright is the relevant decision maker. Apple Gold states that Shoemaker fired Surratt, implying that Shoemaker was the relevant decision maker.

18 Hambright's statement to the EEOC Investigator indicates that Surratt's "attitude towards management was becoming worse" and that Surratt "had never been respectful of management." (Hambright EEOC Witness Interview, at 1.) While Hambright acknowledged that "[t]here was nothing wrong with [Surratt's] job performance and skills[sic] set . . .," Surratt "would ignore directions or not answer when spoken to." (Id.)

management was experiencing with Surratt or merely brought the difficulties with Surratt more sharply into focus.

Viewing the facts in the light most favorable to Plaintiff Surratt, the question of Surratt's job performance and alleged acts of insubordination, which involves evaluating the credibility of the witnesses and weighing the evidence presented, falls squarely within the province of the jury. Because genuine disputes of material fact exist, Apple Gold's motion will be <u>denied</u>.

## V.

**IT IS HEREBY ORDERED** that this matter will proceed to jury trial during the January 2013 Statesville Trial Term, with Calendar Call occurring on Monday, January 7, 2013 at 10:00 a.m., and Jury Selection beginning on Tuesday, January 8, 2013 at 9:30 a.m.

Signed: December 18, 2012

Richard L. Voorhees
United States District Judge